UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Gerasimos Valsamis,

    *Plaintiff,*

v.

John Crane Inc.,

    *Defendant.*

No. 18 CV 7079

Judge Lindsay C. Jenkins

**Memorandum Opinion and Order**

Plaintiff Gerasimos Valsamis is a talented machinist. For twenty-five years, he worked in Defendant John Crane Inc.'s Adaptive Hardware Department, manually operating machine tools. Plaintiff's work during this time was exemplary. In 2016, however, Plaintiff struggled with a severe bout of depression and anxiety that compromised his ability to safely operate heavy machinery. On April 13, 2016, Plaintiff went on medical leave to seek treatment for these conditions, catalyzed by a panic attack he suffered at work.

Several months passed, and Plaintiff exhausted all available FMLA and short-term disability leave. After Plaintiff's request for long-term disability was denied, John Crane sought information from Plaintiff's physicians about the severity of his condition, the possibility of accommodation, and when it could expect him to return to work. Although Plaintiff's physicians were optimistic that Plaintiff would recover, none cleared him to return, estimating that he would need anywhere from one to three more months before he could handle the stressors of the workplace. Shortly after receiving this information, John Crane terminated Plaintiff's employment.

This employment discrimination suit followed. Before the Court is Defendant's motion for summary judgment. [Dkt. No. 76]. Although Plaintiff initially brought claims for national origin, age, and disability discrimination as well as retaliation under state and federal law, he has opted to oppose summary judgment only on his claim that Defendant failed to accommodate his disabilities in violation of the ADA. [Dkt. No. 89, 3 n.2]. For the reasons set forth below, the Court grants Defendant's motion for summary judgment on that lone remaining claim.

I. **Background**

The Court draws its facts from the parties' Local Rule 56.1 statements and responses. [78], [90], [95]. However, where the parties' filings leave out relevant information, the Court pulls additional material from the record. *See* FED. R. CIV. P. 56(c)(3) (noting that "courts need consider only the cited materials, but . . . may consider other materials in the record" as well). The Court's decision to cite as undisputed a statement of fact that a party has attempted to dispute reflects its determination that the evidence cited by the disputing party fails to show a genuine dispute as to that fact.

John Crane is an international manufacturer of "engineered sealing systems." [Dkt. No. 91-1, p. 9, Exhibit A].[1] The company hired Plaintiff on October 28, 1991, as a manual machinist at its Morton Grove facility, where he worked for nearly twenty-

---

[1] The Exhibits in this case are contained in four omnibus filings. *See generally* [Dkt. No. 78-1]; [Dkt. No. 78-2]; [Dkt. No. 78-3]; [Dkt. No. 91-1]. Each filing contains many exhibits. For ease of reference, the Court's citation to pages within those filings will follow the same general convention: [Dkt. No., overall page number, exhibit, and a further pincite within the exhibit if appropriate].

five years. [Dkt. No. 90, ¶ 12]. The Morton Grove facility—now John Crane's corporate headquarters—is comprised of five buildings. [Dkt. No. 95, ¶ 85]; [Dkt. No. 78-1, p. 3, Exhibit A, Cobb Dep Tr. 6:24–8:18].[2] Plaintiff worked in the Adaptive Hardware Department, [Dkt. No. 90, at ¶ 13], which was housed in Building A. *See* [Dkt. No. 78-1, p. 3, Exhibit A, Cobb Dep. Tr. 7:23–8:2]; [Dkt. No. 95, ¶ 86].

As a manual machinist, Plaintiff manufactured parts—largely for mechanical seals—using manual machine tools, in particular the manual lathe. [Dkt. No. 78-1, pp. 196–97, Exhibit C, Valsamis Dep. Tr. 29:23–30:12]; [*id.* at p. 263, Exhibit E, Presi Dep. Tr. 14:24–25]. Plaintiff did not create the parts from scratch. His job was to bring preexisting parts into conformity with their specified tolerances. [*Id.* at p. 263, Exhibit E, Presi Dep. Tr. 15:1–16:12]. A tolerance is simply the amount by which the dimensions of a part are permitted to vary from its ideal specifications. [*Id.* at 15:16–16:1]. A blueprint, for example, might specify that a part be one-inch in diameter, plus or minus a thousandth of an inch. A part with a diameter outside of this range may not function as designed, and it was Plaintiff's job to correct such deficiencies.

---

[2]      Throughout Plaintiff's statement of additional facts, Plaintiff cites generally to Defendant's exhibits (e.g., Dkt. No. #78-1, 5:24–6:12) without citing to a specific page or referencing a specific exhibit. Given the size of those documents, which range from 125 to 375 pages and contain numerous exhibits, this omission makes it more difficult to identify the specific exhibit Plaintiff is referencing. In response, Defendant chose to "dispute" such facts as unsupported in lieu of responding to their substance. In most cases, the Court was able to identify rather easily the referenced exhibit. No doubt, Defendant could have as well. Defendant's objection rings particularly hollow in light of the availability of an appendix of exhibits, [Dkt. No. 90], and its *own* failure to provide specific page numbers (as opposed to mere exhibit identifications and transcript cites). In the interest of deciding this case on its merits rather than on technicalities, the Court will exercise its discretion to consider all facts where supported by evidence in the record. As the Court will explain below, even on this broader view of the record, Plaintiff has not demonstrated the existence of a genuine dispute of material fact on all elements of his *prima facie* failure-to-accommodate claim.

By all accounts, Plaintiff was an exceptionally skilled machinist. In annual review after annual review, Plaintiff's supervisors effusively praised the quality of his work. [Dkt. No. 78-1, pp. 332–351, Exhibit G]; [Dkt. No. 90, ¶¶ 15–16]. This view was shared by his fellow machinists, many of whom considered Plaintiff the single best manual machinist (if not machinist) at John Crane. [Dkt. No. 91-1, p. 368, Exhibit J, ¶ 3]; [*id.* at p. 372, Exhibit K, ¶ 4]; [*id.* at p. 376, Exhibit L, ¶ 3]. To manufacture parts more efficiently, Plaintiff built custom tools that no other machinist had the skills to recreate. [*Id.* at p. 378, Exhibit L, ¶ 7]. In the estimation of one co-worker, Plaintiff's work saved John Crane millions of dollars. [*Id.* at p. 376, ¶ 3].

Plaintiff achieved this mastery in spite of serious medical challenges. He has suffered from major depressive disorder, generalized anxiety disorder, and episodic panic attacks since the 1990s. [Dkt. No. 90, ¶¶ 24–25]. When Plaintiff has panic attacks, they can be severe. Plaintiff has lost consciousness during attacks, and on several occasions, they have landed Plaintiff in the hospital. [Dkt. No. 78-1, p. 210, 213, Exhibit C, Valsamis Dep. Tr. 83:11–16, 95:1–4, 96:18–22].

For many years, Plaintiff was symptom free. [*Id.* at p. 211, 87:4–89:21]. Around 2014 or 2015, however, Plaintiff's depression and anxiety returned, precipitated by stress at home and at work. [*Id.* at pp. 210–211, 85:1–5, 88:14–22]. The latter stemmed from mistreatment Plaintiff claims to have suffered at the hands of Tim Presi, one of his supervisors in the Adaptive Machinery Department.[3] [Dkt. No. 90, ¶

---

[3]      Throughout his tenure at John Crane, Plaintiff and his fellow machinists reported to a shop supervisor, who in turn reported to a shop manager. [Dkt. No. 78-1, pp. 201–02,

14]; [Dkt. No. 91-1, pp. 367–78, Exhibits J–L]. These incidents lay at the foundation of the discrimination claims Plaintiff has since abandoned. The Court need not recount them in detail. Suffice it to say that Presi allegedly treated Plaintiff poorly, encouraging other employees to use his custom tools, referring to him as "the Greek" and "the Greek guy," and rescinding approval of a vacation he planned to take to visit his elderly parents in Greece. [Dkt. No. 78-1, pp. 211, 235, Exhibit C, Valsamis Dep. Tr. 86:2–22; 182:20–184:6].

These incidents—among a confluence of other factors—brought about a decline in Plaintiff's mental health. In April of 2016, Plaintiff suffered a panic attack while on the job. [*Id.* at p. 213, 95:10–96:14]. On April 13, 2016, shortly after that attack, Plaintiff went on medical leave, informing Defendant of his intent to do so pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, which entitles eligible employees suffering from "serious health condition[s]" to 12 weeks of leave per year. 29 U.S.C. § 2612(a)(1)(D). In response to that request, Defendant requested a certification from one of Plaintiff's physicians. 29 U.S.C. § 2613(a); [Dkt. No. 78-2, p. 2, Exhibit K].

On April 25, 2016, Plaintiff submitted a formal FMLA request, complete with the requested certification. [Dkt. No. 90, ¶ 27]; [Dkt. No. 78-2, pp. 2–7, Exhibit K]. In that certification, Dr. Demetrios J. Giokaris stated that Plaintiff was unable to perform the essential functions of his position because he could not "concentrate"

---

Exhibit C, Valsamis Dep. Tr. 49:22–50:14]. Tim Presi was promoted to shop manager in 2013, after a stint as shop supervisor. [Dkt. No. 90, ¶ 14]; [Dkt. No. 78-1, p. 282, Exhibit E, Presi Dep. Tr. 91:24–92:1].

sufficiently.[4] [Dkt. No. 78-2, p. 5, Exhibit K]; [Dkt. No. 90, ¶¶ 28–29]. Dr. Giokaris estimated that Plaintiff would be out until at least June 1. [Dkt. No. 78-2, p. 5, Exhibit K].

On April 27, Defendant approved Plaintiff's FMLA request. [Dkt. No. 90, ¶ 31]. That approval covered the leave Plaintiff had already taken since April 13, 2016, and extended to June 1, the date Dr. Giokaris estimated Plaintiff would be healthy enough to return to work. [*Id.* at ¶ 32].

Shortly after Defendant's FMLA leave was approved, Plaintiff began seeing Dr. Peter Hsin for psychiatric treatment. Dr. Hsin evaluated Plaintiff on April 26, May 10, and May 26, 2016. [Dkt. No. 78-2, p. 16, Exhibit N]. As June 1 approached, however, it became clear that Dr. Giokaris's estimated return-to-work date was over-optimistic. Plaintiff remained depressed and anxious, his concentration was "still poor," and he could not keep track of conversations. [*Id.*]

So, on May 31, the day before Plaintiff's approved leave period was set to expire, Plaintiff requested additional leave in a letter to Todd Frederick and Jan Tuton, Human Resource Managers at John Crane. [*Id.* at p. 13]; [Dkt. No. 90, ¶ 41]. In an attached certification, Dr. Hsin warned that Plaintiff could not safely operate machinery in his condition. [Dkt. No. 78-2, p. 17, Exhibit N]. Dr. Hsin estimated that Plaintiff would remain incapacitated through August 31, 2016, an additional three months. [*Id.*]; [Dkt. No. 90, ¶ 42].

---

[4]    Machine tools are highly dangerous and momentary lapses in concentration can result in tragedy. As Plaintiff would later recount to another one of his treating physicians, he has personally witnessed fellow machinists suffer injuries requiring amputation. [Dkt. No. 78-1, p. 369, Exhibit I, ¶ 4].

In addition to requesting an extension, Plaintiff also inquired whether "there [were] any reasonable accommodations that [could] be made so that [he] might be able to return to work earlier." [Dkt. No. 78-2, p. 13, Exhibit N]. Ann Cobb, HR Manager at John Crane, acknowledged in her deposition that although this request was not submitted through John Crane's ordinary channels, there is no question that Plaintiff was seeking an accommodation for his disabilities at that time. [Dkt. No. 78-1, p. 26, Exhibit A, Cobb. Dep. Tr. 100:6–15]; [Dkt. No. 95, ¶ 105].

In response to Plaintiff's letter, Frederick and Tuton "sent Plaintiff information related to John Crane's short-term disability benefits." [Dkt. No. 90, ¶ 38]. After reviewing those materials, Plaintiff followed up with a second letter. In that letter, also dated May 31, Plaintiff reiterated his interest in an accommodation. [Dkt. No. 78-2, p. 11, Exhibit M]. Plaintiff stressed that "[i]n order to return to work," he would have to "be in a supervisory position" free from harassment by Tim Presi. [Id.].[5]

Sometime after this exchange, Plaintiff put in a request for short-term disability, which Defendant ultimately granted.[6] [Dkt. No. 90, ¶ 45]. Curiously, there is no documentation of the approval and no consensus on what day it was set to

---

[5]     The parties dispute exactly what Plaintiff meant by "supervisory." [Dkt. No. 90, ¶ 35]. Defendant claims that Plaintiff was demanding a promotion. [Dkt. No. 95, ¶ 98]. Plaintiff maintains he was simply indicating that he was capable of performing supervisory functions like training other machinists, inspecting parts, and other non-machine work that might be helpful to the company. [Dkt. No. 90, ¶ 35]. Several of Plaintiff's colleagues recall similar accommodations being made in the past, [Dkt. No. 91-1, p. 369, Exhibit J, ¶ 8]; [id. at pp. 372–73, Exhibit K, ¶ 8]; [id. at p. 377, ¶ 10], though none give specific examples. Whatever the case, there is a genuine dispute of fact on the question.

[6]     It is apparently undisputed that Plaintiff was entitled to take FMLA leave through July 6, 2016, [Dkt. No. 95, ¶ 140], so it is not at all clear why the extension was not at least in part granted pursuant to that statute. Neither party explains this discrepancy.

expire. Defendant claims that the approval extended Plaintiff's leave through August 10, 2016, but Plaintiff is correct that the only evidence Defendant cites for this fact is Plaintiff's acknowledgement during his deposition that it is "possible" the extension ran through that date. [*Id.*]; [Dkt. No. 78-1, pp. 222–223, Valsamis Dep. Tr. 133:22–134:5].

As the clock ran down on Plaintiff's short-term disability leave, Plaintiff looked into Defendant's long-term disability program, which was administered by Prudential Insurance Company of America ("Prudential"), a third-party provider. Prudential had unilateral authority to grant or deny applications for long-term disability benefits. [Dkt. No. 90, ¶¶ 48, 54]; *see also* [Dkt. No. 78-2, pp. 20–22, Exhibit O]. On July 1, Jan Tuton sent Plaintiff information about applying for benefits through Prudential. [Dkt. No. 90, ¶ 47]. Plaintiff submitted his application on August 3, 2016, a week before his short-term disability benefits were apparently set to expire. [Dkt. No. 78-2, pp. 24–25, Exhibit P].

Like Plaintiff's FMLA and short-term disability requests before, Plaintiff's long-term disability application included a medical certification. In this one, Dr. Hsin reported that Plaintiff remained unable to operate machinery because "his concentration [was] off and there [was] not much margin for error." [*Id.* at p. 25]; [Dkt. No. 90, ¶ 50]. He further stated that Plaintiff was unable "to handle normal work stress due to his anxiety." [Dkt. No. 78-2, p. 25, Exhibit P]; [Dkt. No. 90, ¶ 51]. According to Dr. Hsin, Plaintiff possessed neither "[f]ull-time work capacity" or "[p]art-time transitional work capacity." [Dkt. No. 78-2, p. 24, Exhibit P]. Extending

his previous return-to-work date yet further, Dr. Hsin projected that Plaintiff's incapacity would continue through October 28, 2016, an additional two months and more than six months since his leave began on April 13. [*Id.*]; [Dkt. No. 90, ¶ 53].

On September 1, 2016, Prudential denied Plaintiff's application for long-term benefits. [Dkt. No. 90, ¶ 54]. At this point, Plaintiff's FMLA and short-term disability leave had expired.[7] [*Id.* at ¶¶ 46, 56]. Not quite a week later, Defendant sent Plaintiff a letter informing him that he might be terminated, but not until a "full review" of his medical condition was conducted, including "whether there exist any reasonable accommodations which would enable [him] to continue employment." [Dkt. No. 78-2, p. 31, Exhibit R]; [Dkt. No. 90, ¶ 57].

To this end, the letter advised Plaintiff that Defendant needed information from his physicians to "clarify" his "medical status" and determine whether he could "safely perform the essential functions of [his] job, with or without any reasonable accommodations." [Dkt. No. 78-2, p. 31, Exhibit R]. Enclosed was a questionnaire Plaintiff was asked to provide to his physicians, to be returned no later than September 21. That questionnaire asked a number of questions about Plaintiff's current health status and near-term prognosis.

Plaintiff provided the questionnaire to three physicians: (1) Dr. Hsin, his psychiatrist; (2) Dr. Martin J. McCarthy, his psychologist; and (3) Dr. Thomas Ficho, an internal medicine physician Plaintiff had seen a number of times in 2015 and 2016.

---

[7] Although there is some dispute regarding when exactly Plaintiff's short-term disability expired, nobody contends that Plaintiff was still actively utilizing short-term disability when his application for long-term benefits was denied.

Dr. Hsin completed the questionnaire on September 19, 2016. In response to the question whether Plaintiff had any disabilities or ongoing medical restrictions, Dr. Hsin assessed that Plaintiff was "still disabled and should not go back to work." [Dkt. No. 78-3, p. 3, Exhibit U, ¶ 3]. Although Plaintiff had experienced "some days where he felt better," those breakthroughs were not, in his view, "consistent enough or sustained enough for a work environment." [*Id.*] Dr. Hsin expressed concern that Plaintiff continued to suffer from poor concentration and felt that were Plaintiff to return, he would not "handle work stress appropriately." [*Id.*]

For these reasons, Dr. Hsin assessed that Plaintiff was "not able to perform [the] essential functions of his job as a Machinist." [*Id.* at ¶ 4]. When asked if there were any accommodations that might allow Plaintiff to return, Dr. Hsin stated that he could not "think of [any] accommodations that [would] allow [Plaintiff] to work safely and effectively in his current condition." [*Id.* at p. 4, ¶ 5]. When asked if Plaintiff would eventually recover from his disabilities, Dr. Hsin expressed optimism that he would eventually "get better," but uncertainty about "how long that [would] take." [*Id.* at ¶ 6]. Dr. Hsin predicted that recovery would "take another 2 or 3 months at least" and noted that "[i]t is hard to predict treatment responses." [*Id.* at p. 5, ¶ 7].

Dr. McCarthy, Plaintiff's psychologist, completed his questionnaire the next day. [Dkt. No. 78-3, Exhibit V, pp. 9–14]. His responses largely track Dr. Hsin's. According to Dr. McCarthy, Plaintiff's symptoms had improved for a time, but Prudential's denial of his application for long-term benefits caused a relapse. [*Id.* at p. 9, ¶ 2]. In his "considered professional opinion," Plaintiff was "not yet ready to

return to the workplace." [*Id.* at p. 10, ¶ 3]. Dr. McCarthy expressed optimism that plaintiff would "be ready to return to work on a trial basis in one or two or three months," after "another relatively brief period of treatment." [*Id.* at pp. 11–12, ¶¶ 5, 7].

Dr. McCarthy identified a number of potential accommodations that might allow Plaintiff to return to work, but stressed that his depression needed to "remit[] further" before they could be implemented. [*Id.* at p. 10, ¶ 4]. In the event Plaintiff did not recover sufficiently to safely operate manual machine tools, Dr. McCarthy suggested that he could be "train[ed] on use of computerized" machine tools. [*Id.* at p. 11, ¶ 5]. Alternatively, Dr. McCarthy proposed that Plaintiff "be moved to another work group or to another part of the company" away from Tim Presi. [*Id.*] These ideas were preliminary and contingent on Plaintiff's continued recovery. Only after additional improvement did Dr. McCarthy feel that they would be able to determine "what accommodations, if any, would be needed and appropriate." [*Id.* at p. 12, ¶ 7].

Dr. Ficho submitted his questionnaire on September 30, 2016, well after the September 21 deadline. [Dkt. No. 91-1, p. 254, Exhibit D, ¶ 10]. Defendant claims that it did not rely on the Ficho questionnaire in terminating Plaintiff. [Dkt. No. 90, ¶ 69]. Plaintiff maintains that the questionnaire was in Defendant's possession before the decision was made and is, therefore, relevant. [*Id.*] Because Defendant does not dispute that the questionnaire was at least on-hand before the Plaintiff's termination, the Court will explore Dr. Ficho's questionnaire responses as well.

11

Like Dr. Hsin and Dr. McCarthy, Dr. Ficho felt that Plaintiff's symptoms remained serious enough that it would be dangerous for Plaintiff to work on machinery. [Dkt. No. 91-1, p. 257, ¶ 1]. He additionally reported that Plaintiff's medications caused side effects that prevented him from engaging safely in a number of other tasks, like lifting heavy items and climbing ladders. [*Id.* at p. 258, ¶ 3]. When asked whether there were any reasonable accommodations that might permit Plaintiff to complete the essential functions of his job, Dr. Ficho demurred, explaining that he lacked sufficient knowledge of "other jobs at [the Morton Grove] facility that he is qualified to perform" to fully explore the possibility of accommodation. [*Id.* at ¶ 4]. Like Dr. Hsin and McCarthy, Dr. Ficho expected Plaintiff to recover, but expected that that would likely take more time. [*Id.* at p. 259, ¶ 6]. He agreed with Dr. Hsin's recommendation that Plaintiff "not work until 10/31/2016." [*Id.* at p. 260, ¶ 7].

It is undisputed that Defendant "relies on medical experts' representations" to determine "whether it is feasible to provide an accommodation to employees." [Dkt. No. 90, ¶ 68]. After reviewing at least the Hsin and McCarthy questionnaires (and possibly the Ficho questionnaire as well) Defendant "determined that Plaintiff's healthcare providers were unable to identify a date certain that he would be able to return to work." [*Id.* at ¶ 70]. Upon reaching this conclusion, HR Manager Todd Frederick recommended that Plaintiff be terminated. [*Id.* at ¶ 75]. On September 30, 2016, Mark Glennerster, Director of Operations, Gas, Seals, and Bellows at John Crane, approved the request. [*Id.* ¶¶ 75–76]. Plaintiff was fired that day. [*Id.* at ¶ 77].

12

II.  **Legal Standard**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if its determination by the trier of fact "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute with respect to such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

A court's "function" at this stage "is not . . . to weigh the evidence and determine the truth of the matter," but rather to determine "whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Id.* at 249, 252. In conducting this inquiry, courts must "view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th Cir. 2022).

III.  **Analysis**

As the Court noted above, Plaintiff has chosen to pursue only his failure-to-accommodate claim under the ADA. [Dkt. No. 89, 3 n.2]. The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To comply with this provision, employers must "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee"

unless doing so "would impose an undue hardship on the operation of [employer's] business." 42 U.S.C. § 12112(a), (a)(5).

A *prima facie* failure-to-accommodate claim consists of three elements. The plaintiff-employee must prove (1) that he "is a qualified individual with a disability;" (2) that the defendant-employer "was aware of [his] disability;" and (3) that the defendant-employer "failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (internal quotations omitted).

There is no dispute in this case that Plaintiff was disabled. There is also no dispute that Defendant was aware of Plaintiff's mental health issues. The only element of Plaintiff's *prima facie* case that is disputed is whether Plaintiff was a "qualified individual" within the meaning of the statute and, if so, whether John Crane failed to "reasonably accommodate" his disabilities.

Defendant moves for summary judgment on both issues. [Dkt. No. 77, 10–11]. To survive Defendant's motion, Plaintiff must therefore "come forward with evidence" that would permit a reasonable jury to find (1) that he was a "qualified individual" and (2) that John Crane failed to reasonably accommodate his disabilities. As the Court now explains, Plaintiff has not made this showing.

An employee is a "qualified individual" if he "can perform the essential functions of the employment position that [he] holds or desires," "with or without reasonable accommodation." *Id.* at § 12111(8). The phrase "essential function" is a legal term of art that denotes those tasks so inherent in the nature of a position that a disabled employee's inability to perform them with the aid of reasonable

accommodation justifies the employer in disqualifying that employee from holding that position.

Whether a given ability is an essential function "is a factual question, not a question of law." *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016). Although "[t]he statutory text of the ADA provides little guidance on how to determine whether a particular job function is essential or not," the ADA's implementing regulations "identify seven non-exclusive categories of evidence" bearing on that inquiry. *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022). Those factors include:

   (i)   The employer's judgment as to which functions are essential;

   (ii)  Written job descriptions prepared before advertising or interviewing applicants for the job;

   (iii) The amount of time spent on the job performing the function;

   (iv)  The consequences of not requiring the incumbent to perform the function;

   (v)   The terms of a collective bargaining agreement;

   (vi)  The work experience of past incumbents in the job; and/or

   (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Critically, an employee who is unable to fulfill the essential functions of his current job may nonetheless be able to fulfill the essential functions of another position. Although employers are not "required to 'create a new job or strip a current job of its principal duties to accommodate a disabled employee,'" a disabled employee may be entitled to "[r]eassignment to a vacant position" for which he is qualified. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) (quoting

15

*Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010)).

Plaintiff contends that there is sufficient evidence for a reasonable jury to find that he was qualified to perform the essential functions of his position as a manual machinist. [Dkt. No. 89. 7–8]. Alternatively, he argues that even if he was not qualified to work as a manual machinist, he was at least qualified to perform the essential functions of another position at John Crane.[8] [*Id.* at 8–9]. Finally, he contends that regardless of whether he was entitled to an accommodation, Defendant's failure to engage in the interactive process is itself actionable. [*Id.* at 9–13].

The first argument can be quickly dispensed with. Plaintiff does not dispute that operating machinery was an essential function of his position as a manual machinist. [Dkt. No. 89, 7] ("Contrary to Defendant's assertion, Valsamis' essential

---

[8]     Plaintiff's opposition brief and Rule 56.1 statement hints at a third possible argument that he never explicitly makes and is therefore waived. An employer that maintains a policy of creating light-duty positions for occupationally injured employees must generally extend the benefit of such a policy to disabled employees, even where the employee's disability is not job-related. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017); *see also* EEOC Enforcement Guidance: Workers' Compensation and the ADA, 2 EEOC Compliance Manual (CCH) ¶ 6905, at 5394 (Sept. 3, 1996), 1996 WL 33161342, at *12. There is evidence in the record, though vague and non-specific, that Defendant has previously allowed "other employees in Valsamis' department" to perform off-machine work while recovering from disabilities. [Dkt. No. 90, ¶¶ 129, 145–147]. Plaintiff references this history in his opposition brief, but nowhere argues that Defendant actively maintained a light-duty policy during Plaintiff's leave or at the time of Plaintiff's termination, let alone that Plaintiff was entitled to the benefit of such a policy. At most, Plaintiff relies on this history to bolster his claim that Defendant could have, but chose not to, accommodate his disabilities. *See* [Dkt. No. 89, 6]. The Court therefore deems any argument that such a policy existed and should have been extended to Plaintiff waived. In any case, and as the Court explains below, that argument would fail for the independent reason that Plaintiff's physicians did not clear him to return to any kind of work when he was terminated, rendering him unqualified to perform even light-duty work.

job functions were *more than just* working on the machine.") (emphasis added). He also does not dispute that when he was terminated, he "could not work on [his] machine." [*Id.*] Plaintiff attempts to blunt the impact of his admission by arguing that "his job included *other* essential functions" as well, and identifying a number of off-machine duties that he claims were essential functions of his position, including inspecting parts and assisting and training others. [*Id.*] Plaintiff argues that because he could complete some—though admittedly not all—essential functions of his job, he was a "qualified individual" under the ADA.

Plaintiff misunderstands the law. As Defendant correctly argues in reply, a disabled employee is a "qualified individual" only if, with or without reasonable accommodation, he can perform *every* essential function of his position, not merely some of them. 42 U.S.C. § 12112(8) defines "qualified individual" as one who, "with or without reasonable accommodation, can perform *the* essential functions," not *some of the* essential functions, "of the employment position that such individual holds or desires." The Seventh Circuit routinely affirmed grants of summary judgment on the basis of employees' inability to perform just one essential function. *E.g.*, *Jackson v. Humana Ins. Co.*, 2023 WL 2207632, at *2 (7th Cir. Feb. 24, 2023) (ability to handle phone calls); *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020) (ability to lift heavy packages). It has done so, moreover, without regard to the possibility that those employees might be able to perform other essential functions. Although employers may choose to excuse the performance of an essential function, the ADA does not require them to do so. *Tate v. Dart*, 51 F.4th 789, 801 (7th Cir. 2022) (holding

17

that the ADA did not require an employer to excuse a correctional officer from "be[ing] able to respond physically to violent emergencies," an essential function of his position). Plaintiff's acknowledgment that he was unable to safely operate his machine, coupled with his admission that doing so was an essential function of his job as a manual machinist, dooms any argument that he was a qualified individual with respect to that position.

Plaintiff's second argument—that he was qualified to perform other positions at the Morton Grove facility, [Dkt. No. 89, 8–9]—fails for lack of evidence. As the Court noted above, "an employer may be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential functions of the job [he] holds." *Jackson v. City of Chicago*, 414 F.3d 806, 812–13 (7th Cir. 2005). To succeed on a claim that an employer failed to do so, however, the employee bears the burden of identifying, by name, a specific, vacant position that was "available at the time of his termination" but not offered to him by his employer. *Severson*, 872 F.3d at 482.

In opposition to Defendant's motion for summary judgment, Plaintiff does not identify any position at John Crane that he was qualified to perform and that was vacant either during his leave or when he was terminated. Instead, he simply points to the fact that he requested a "supervisory" role in his May 31 accommodation request, [Dkt. No. 78-2, p. 11, Exhibit M], and to the fact that John Crane employed hundreds of people in a variety of roles at its Morton Grove headquarters. Plaintiff's position appears to be that because he was qualified to complete off-machine tasks of

18

various kinds, and because John Crane had many positions that involved non-machine-related work, he can survive summary judgment on the sheer possibility that one such position was open. But, again, it is *his* burden to prove that such a position exists, not Defendant's burden to disprove the existence of any such position. *Novak v. Nicholson*, 231 Fed. App'x 489, 492 (7th Cir. 2007).

Even if Plaintiff could point to such a position, the unfortunate reality is that, as of his termination, none of his physicians had cleared him to return to work of *any* kind. On September 19, 2016, Dr. Hsin stated unequivocally that Plaintiff "should not go back to work" and that he was not yet capable of "handl[ing] work stress appropriately." [Dkt. No. 78-3, p. 3, Exhibit U, ¶ 3]. The next day, Dr. McCarthy proposed several accommodations, but made clear that Plaintiff's depression needed to "remit[] further" before he would be "ready" to "return to work on a trial basis." [Dkt. No. 78-3, Exhibit V, pp. 10, 12, ¶¶ 4, 7]. And Dr. McCarthy stated, unambiguously, that, in his "considered professional opinion," Plaintiff was "not yet ready to return to the workplace." [*Id.* at p. 10, ¶ 3]. Dr. Ficho's views are not to the contrary. Like Dr. Hsin and McCarthy, Dr. Ficho expected Plaintiff to recover, [Dkt. No. 91-1, p. 259, Exhibit D, ¶ 6], but anticipated that that would likely take more time, concurring in Dr. Hsin's recommendation that Plaintiff "not work until 10/31/2016." [*Id.* at p. 260, ¶ 7].

Defendant was entitled to rely on these views. "[A]bsent evidence to the contrary, a doctor's view that an employee cannot 'return to work . . . in any position' means an employee cannot 'establish that she is a 'qualified individual with a

19

disability' under the ADA.'" *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 968 (7th Cir. 2020) (quoting *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996)); *see also Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Not working is not a means to perform the job's essential functions.").

Plaintiff maintains that the questionnaire responses his physicians provided were "ambiguous and open-ended" such that Defendant had a duty "to follow up with" Plaintiff's physicians "to properly assess the possibility of accommodating" Plaintiff. [Dkt. No. 89, 6]. The Court disagrees. All three of Plaintiff's physicians indicated that Plaintiff was not ready to return to work. And although each thought accommodations of some kind might be appropriate down the line, none thought it wise for Plaintiff to return to work in *any* capacity until his symptoms were under control. They estimated Plaintiff would need anywhere from 1 to 3 more months of leave.

Plaintiff emphasizes that he has never "admitted that he was unable to return to work in any position," [Dkt. No. 89, 4], but that fact does not move the needle. As the Seventh Circuit emphasized in *McAllister*, "[i]t would defy common sense to demand" employers to "disregard . . . well-documented medical opinions and allow its employees . . . to prematurely return to work, thereby jeopardizing their safety." 983 F.3d at 969. Defendant was under no obligation to do so here.

The views of Plaintiff's physicians provide an independent ground for granting Defendant's motion. Plaintiff's admission that he was, at all relevant times, unable to operate his machine, together with his failure to identify another position at John

Crane available for him to fill, would prevent any reasonable jury from finding that he was a "qualified individual" under the ADA. That Plaintiff's physicians had not cleared him to return to work reinforces this conclusion.

For these reasons, the Court holds that Plaintiff was not a "qualified individual" at the time of his termination and, therefore, not entitled to accommodation. All that remains of Plaintiff's failure-to-accommodate claim, then, is the argument that even if Defendant did not fail to accommodate Plaintiff's disabilities, its failure to engage in the interactive process is itself actionable. [*Id.* at 3]. This theory, too, falls short.

"[T]he ADA . . . envision[s] a flexible, interactive process by which an employer and employee" at least attempt to identify an "appropriate reasonable accommodation" for the employee's disability. *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000). Employer and employee bear a shared duty to engage in this dialogue in good faith. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805–806 (7th Cir. 2005); *Brown v. Milwaukee Bd. of School Directors*, 855 F.3d 818, 821 (7th Cir. 2017) (emphasizing that "both parties are responsible for [the interactive] process.").

Nevertheless, the interactive process is "not an end itself," and the Seventh Circuit has held that "a plaintiff cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in [the] interactive process." *Id.*; *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) ("[T]here is no separate cause of action for a failure of [the] interactive process."). To the

21

contrary, a failure to engage is actionable only "in circumstances where the" employer's recalcitrance results in a "failure to provide a reasonable accommodation."[9] *Id.*

Plaintiff appears to argue that "Defendant's inaction during what should have been the interactive process mandated by the ADA" is actionable regardless of whether he was a "qualified individual" and, thus, entitled to an accommodation. [Dkt. No. 89, 3]. This argument is flatly inconsistent with a long line of Seventh Circuit precedent and, therefore, must be rejected. Because Plaintiff has not identified any reasonable accommodation that existed, but was not identified prior to Plaintiff's termination, as a result of Defendant's failure to engage in the interactive process, and because Defendant's failure to engage does not furnish an independent basis for ADA liability, Plaintiff's final argument fails.

*      *      *      *      *

To recap, because Plaintiff was unable to operate manual machine tools at the time of his termination—an essential function of his job as a manual machinist—he was not a qualified individual with respect to that position. And because Plaintiff has failed to identify any open position for which he *was* qualified at that time, he was not a qualified individual with respect to any other position either. Even if he could identify such a position, Defendant was entitled to rely on the considered judgment

---

[9]     A failure to engage in the interactive process may also be actionable where it contributes to unreasonable delay in the identification of a suitable accommodation. *Monroe v. Jewel Food Stores, Inc.*, 2023 WL 2018907, at *9–10 (N.D. Ill. Feb. 15, 2023); *see also McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020); *Swain v. Wormuth*, 41 F.4th 892, 898 (7th Cir. 2022).

of Plaintiff's physicians that he was not yet able to return to work. Finally, because a failure to engage in the interactive process is not an independent basis for ADA liability, Plaintiff cannot survive summary judgment on that basis either. Having rejected all of Plaintiff's theories of liability, the Court concludes that Defendant is entitled to summary judgment.

IV.    **Conclusion**

For the reasons set forth in this opinion, Defendant's motion for summary judgment, [Dkt. No. 76], is granted in full. Civil case terminated.


Enter: 18-7079
Date: June 8, 2023


United States District Court Judge